OMAN et al. v. BEDFORD–BOWLING GREEN STONE CO.

(Circuit Court of Appeals, Sixth Circuit. January 10, 1905.)

No. 1,354.

1. JUDGMENTS—RES ADJUDICATA.
    A decision of the state Court of Appeals to the effect that the owner of cutting-stone rights had no property right in a switch over the land is res adjudicata, as to such ownership, in a subsequent suit between the parties.

2. RAILROADS—SALE OF SWITCH—OBLIGATIONS TO PUBLIC.
    The sale of a terminal switch by a railroad to the owner of the land over which it is laid does not violate any public obligation of the railroad.

3. SAME—MOTIVES.
    The motives of a railroad in selling a terminal switch to the proprietor of the land over which it is laid do not affect the validity of its action.

4. FIXTURES—RAILROAD TRACKS—RIGHTS OF LANDOWNER.
    Rails, ties, etc., constituting the tracks of a railroad, when bought by the proprietor of the land over which they were laid, were not so immovably attached to the soil as to preclude it, as against an owner of cutting-stone rights in the land, from treating them as it saw fit—either using them as tracks, or removing them as personal property.

5. QUIETING TITLE—CLOUD—RIGHT TO USE RAILROAD TRACK.
    A claim by the owner of cutting-stone rights of the right to have tracks kept on the land, to be used for the shipment of his freight, is the claim of an easement in the land, and a cloud on the title of its proprietor.

6. SAME—REMOVAL OF CLOUD—PARTIES.
    Where a railroad sold terminal tracks to the proprietor of the land on which they were laid, it was not necessary for the latter to make the

former a party in a suit to remove a cloud consisting of a claim advanced by the owner of cutting-stone rights in the land to the right to use the tracks.

**7. JUDGMENTS—RES ADJUDICATA—SCOPE OF DECISION.**

An adjudication in favor of the right of an individual to car service over a side track operated by a common carrier is not conclusive on that right in a subsequent suit, brought after the sale of the track by the carrier to a private corporation which was a party to the former suit, and based upon such sale.

**8. INJUNCTIONS—PROCEEDINGS IN STATE COURTS—INTERFERENCE BY FEDERAL COURTS.**

A decree of the Circuit Court enjoining a party from setting up any claim to the right to use a railroad switch, which the state court had held that he was entitled to use, is not an injunction of proceedings in a state court, in violation of Rev. St. U. S. § 720 [U. S. Comp. St. 1901, p. 581], where, since the decision of the state court was made, the railroad had sold the switch to a private owner, at whose instance the injunction was obtained.

Appeal from the Circuit Court of the United States for the Western District of Kentucky. For opinion below, see 134 Fed. 441.

Lewis McQuown, C. U. McElroy, and Morrison R. Waite, for appellants.

John B. Baskin (John E. Du Bose and Bodley, Baskin & Flexner, of counsel), for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge. This was a suit brought by the appellee, the stone company, against the appellants, the Omans, to quiet the title of the former to certain real estate, known as lots 1 and 4, and the railroad tracks (including rails, ties, etc.) thereon, and to restrain the latter from asserting any interest in said tracks, or claiming the right to use the same for the shipment of their freight. The stone company and the Omans own adjacent quarries in Warren county, Ky., on or near lots 1 and 4. Both these lots are owned by the stone company, but the Omans possess the cutting-stone rights on lot 4. The land on which these quarries are located is connected with the main line of the Louisville & Nashville Railroad Company by a switch about three miles long. The controversy involves the use of the terminal tracks on lots 1 and 4, which carry the switch into the quarry grounds. The switch, including the terminal tracks, was built under a contract between a remote vendor of the stone company and the railroad company. At that time the only quarry there was that owned by the predecessor of the stone company. Under the contract the railroad company was to construct and maintain the switch, receiving a certain rental, based upon its cost; the tracks to remain its property, with the right to remove the same, unless the stone company should desire to purchase and own them. Many years after the opening

¶ 8. Federal courts restraining proceedings in state courts, see notes to Garner v. Second Nat. Bank, 16 C. C. A. 90; Central Trust Co. v. Grantham, 27 C. C. A. 575; Copeland v. Bruning, 63 C. C. A. 437.

of the original quarry by the predecessor of the stone company, and the construction of the switch, the Omans became the possessors of the cutting-stone rights on lot 4, and opened their quarry. Then arose the question as to their right to use the existing switch and terminal tracks. They claimed not only the right to use them in connection with their quarry, but an actual interest therein. This the stone company denied. In consequence, a suit was brought in the local court, which eventually reached the Court of Appeals of Kentucky. 73 S. W. 1038. The parties to that litigation were the stone company, the Omans, and the Louisville & Nashville Railroad Company. In a carefully considered opinion, that court held that, while the Omans did not have any property interest in the tracks on lots 1 and 4, they had the right to have the Louisville & Nashville Railroad Company use the switch, including these tracks, to transport their freight. The court based this right on the fact found by it, that the railroad company, under the existing contracts, owned and operated the switch, including these tracks, as a part of its general system, and, being a common carrier, was, of course, bound to transport the freight of the Omans when delivered at a reasonable point on the switch. After this decision, the stone company, acting under legal advice, purchased from the railroad company the terminal tracks on lots 1 and 4, and brought the present suit to quiet its title thereto. The case was heard below upon the pleadings and the evidence. The court, in an able opinion, sustained the claim of the stone company, and granted the decree prayed for. There are a number of assignments of error. We shall consider those we deem material.

1. The parties to the suit decided by the Court of Appeals of Kentucky were the stone company, the Omans, and the Louisville & Nashville Railroad Company. The action involved the right of the Omans to the use of the switch. The stone company claimed to be the exclusive owner of the switch. On the other hand, the Omans claimed a part ownership, with the right of use, and, if this was overruled, then that the switch was a part of the railroad system of the Louisville & Nashville Railroad Company, over which they had a right to have their freight transported. The lower state court held that the Omans were part owners of the switch, and gave them relief upon that theory, enjoining the stone company from interfering with their use of the switch, and requiring the railroad company to transport their freight over it. The Court of Appeals, after a review of the facts shown, reached the conclusion that the Omans had no interest in the switch, the only interest purchased by them being "an interest in the cutting stone, and not an interest in the railroad switch." This finding is res adjudicata upon the point that the Omans had and have no property interest in the switch. But the Court of Appeals, after an examination of the provisions of the contracts under which the switch was built and was being operated, reached the conclusion that the Omans did have a right to use the switch, in the sense of requiring the railroad company to transport their freight over it, because it was owned

and was being operated by the railroad company as a part of its general system; saying upon this point:

"This contract and other evidence in the record bearing upon this question show that the Louisville & Nashville Railroad Company during the continuance of this last contract had the control and management of the railroad switch. It owns, controls, and operates the engines and other rolling stock which pass over the line. It keeps the roadbed in repair, and owns all of the material which goes into it. So far as this record shows, it exercises the same control and dominion over this line that it does over any other part of its system, and we think, by the terms of the contract in question, the switch, during the continuance of the contract, at least, becomes a part of the general system of the Louisville & Nashville Railroad Company. This being so, it cannot lawfully refuse to receive and transport freight belonging to appellees to and from such reasonable points along the line at which they may lawfully ship, or receive it."

After citing and quoting from some authorities in support of this conclusion, the court says:

"While it is the duty of the railroad company thus to receive and transfer freight for appellee, this can be done only at points along the line of the railroad switch in question at which appellee may lawfully receive or ship it. He has no right to trespass upon the private property of appellants in order to reach the road. We think, under his right to the cutting stone, as now fixed by contract, appellee is entitled to ship and receive freight at any reasonable point along the road, as now constructed, which lies upon any part of the Loving tract, which was set apart and conveyed to him in the settlement had between him and the Columbia Finance & Trust Company. Although the part of the Loving tract upon which the railroad switch lies (being No. 4 on the plat) is now owned in fee by appellants, Bedford-Bowling Green Stone Company, the right to take the cutting stone which belongs to appellee necessarily carries with it such reasonable use of the surface over the stone as is necessary to make appellee's interest in the land available. If it should be found impracticable, from the topography of the land, to reach the railroad on tract No. 4, then appellee may acquire the right of way by contract with appellants, or condemnation under section 815 of the Kentucky Statutes of 1903, to any practicable point on the line, which will not unnecessarily interfere with appellants' quarry as now operated."

It is obvious that this decision was based wholly upon the fact, found to exist under the contracts then in force, that the switch was the property of the railroad company, wholly under its control, and being operated as a part of its system. While thus held and run, the company, under its obligations as a common carrier, could not refuse to receive and transport the freight of the Omans, when delivered at a reasonable point on the switch.

2. The switch was built by the White Stone Quarry Company under a contract with the railroad company by which it agreed to pay the railroad company a certain rental, based on the value of the material in the tracks, which was to remain the property of the latter. By the supplemental contract of May 23, 1893, made by the railroad company with the Bowling Green Stone Company, the latter recognized the former as the sole and exclusive owner of all the material in the existing tracks. A basis of valuation per ton was fixed. The stone company agreed to pay the railroad company, as rent, 6 per cent. per annum on the value of the material, and to keep the tracks in repair at its own expense. If the stone company should be in arrear for rent for six months, the railroad company

could remove the tracks without notice. By the contract of May 1, 1897, between the same parties, the railroad company released the stone company from the payment of rent, and also agreed to keep the tracks in repair; "reserving the right, however, to discontinue doing so, and the right to cancel this contract on sixty days' notice in writing," whenever it should deem the freight furnished insufficient to justify the maintenance of the switch. The contract then provided:

"In case said contract should be canceled in the manner above provided, the said Bowling Green Stone Company is hereby given the right to purchase the material in said track by paying cash to said Louisville & Nashville Railroad Company within sixty days from the receipt of notice of cancellation the value of said material and should the Bowling Green Stone Company fail to exercise its option to purchase said material, then, the said Louisville & Nashville Railroad Company, hereby reserves and is given the right to take up and remove said material without let or hindrance on the part of said Bowling Green Stone Company or any other person."

So it seems the railroad company had reserved the right at any time, on 60 days' notice, to cancel the contract upon which the decision of the Kentucky Court of Appeals was based. Upon the termination of the contract, the stone company was to have the right to purchase the track material within 60 days, and, if it failed to do so, the railroad company might remove them. It is therefore plain that the railroad company, in selling, and the stone company, in buying, the terminal tracks, were only exercising rights expressly reserved under the contract. Nor did the exercise of these rights in any way violate any public obligations of the railroad company. Jones v. Newport News & M. V. R. Co., 65 Fed. 736, 13 C. C. A. 95. Having the right to cancel the contracts as to the entire switch, and sell or remove the materials thereof, it only sold the terminal tracks located on the land of the stone company, and canceled the contracts as to them. Having the right to do this, the motives which induced the action are immaterial. South Dakota v. North Carolina, 192 U. S. 310, 24 Sup. Ct. 269, 48 L. Ed. 448.

3. The rails, ties, etc., constituting the tracks, were held by the railroad company as personal property. When bought by the stone company, they did not for that reason become so immovably attached to the soil as to put it beyond the power of the stone company to treat them as it might see fit. It had the right to continue to use them as tracks, or remove them as personal property. In other words, they became the individual property of the stone company, applicable to whatever use it might put them. But the Omans claimed the right to use them as railroad tracks in the transportation of their freight. This was an assertion of an interest not only in the track material, but in the roadbed—of the right to have the tracks kept where they were, and used for the shipment of their freight. It was the claim of an easement in the real estate, and operated as a cloud upon the title of the stone company.

4. The agreement of sale, having recited the various contracts under which the switch and terminal tracks were built and were being operated, proceeds as follows:

"And whereas said railroad company having this day sold and delivered to said stone company all the ties, rails and other materials in the railroad track located on lots Nos. 1 and 4; * * *

"Now, therefore, it is hereby stipulated and agreed that said four contracts do not and shall not cover nor apply to any part of the railroad tracks located on said lot marked No. 1 nor on lot No. 4, and said railroad company shall not be deemed as bound by said contracts or otherwise to operate, control, use, maintain or haul cars or engines over any part of said tracks which are located on said lot No. 1 and lot No. 4. In all other respects and as to the railroad from Memphis Junction to the easterly boundary of said lot No. 1 said contracts shall remain in full force and effect until the same are terminated by the parties in accordance with the terms and provisions of the same."

The terminal tracks having thus been sold and become the property of the stone company—no longer under the control of the railroad company—was it necessary to make the railroad company a party to this suit to quiet the title of the stone company to the property thus acquired? The appellants insist it was, but we do not think so. This is simply the case of a sale, and the assertion by a third party of an interest adverse to that acquired thereunder. The vendee may bring an action against an adverse claimant to quiet his title without making the vendor a party. The stone company bought the terminal tracks located on its own ground for its individual and exclusive use, and the Omans are claiming the right to use them too. This claim is inconsistent with the title and possession of the stone company. The dispute is between these two parties alone. The railroad company is not interested. It is not setting up any claim inconsistent with the property rights of the stone company. It has not repudiated the sale. It stands by the sale, and, so far as that transaction is concerned, is fully represented by the stone company. The present controversy is between the stone company and the Omans. No third party need be brought in to settle it. Its determination turns altogether upon the effect of the sale in changing the status which existed when the Court of Appeals of Kentucky rendered its decision. If the sale was effective for this purpose, as we believe, then the terminal tracks are the property of the stone company, and a decree in this case will restrain the Omans from claiming any interest in them or any right to use them. If the sale was not thus effective, then they remain under the control of the railroad company, and the mandate of the Court of Appeals of Kentucky will enforce the right of the Omans to use them. In other words, if the sale was good, a new situation exists, which the decree in this case will protect. If bad, the old status continues, with rights which the decree of the Kentucky court will enforce.

5. It is urged that the judgment of the Court of Appeals of Kentucky is a bar to the prosecution of this action; but that cannot be, for this suit is based on the sale of the terminal tracks to the stone company, which did not take place until after the decision of the Kentucky case. Cromwell v. County of Sac, 94 U. S. 351, 352, 24 L. Ed. 195; Roberts v. Northern Pac. R. Co., 158 U. S. 1, 29, 15 Sup. Ct. 756, 39 L. Ed. 873.

6. It is also contended that the decree prayed for in this case will operate to stay proceedings in the Kentucky case, in violation of section 720 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 581]; but we think not, for the Kentucky decree only applies to the switch when in control of the railroad company, and being operated by it under the contracts mentioned. It is still so applicable, but the terminal tracks have been taken out of the contracts, and are now in the possession and control of the stone company. The Omans are still entitled, under the decree of the Kentucky court, to the use of the switch, excluding the terminal tracks, under the limitations defined in the opinion of that court. The judgment of this court will not interfere with the proper enforcement of the decree in that.

The judgment of the lower court is affirmed.